Moncure, P.
This is a writ of error to a judgment of the hustings court of the city of Richmond, rendered on the 23d day of November, 1877, convicting the plaintiff in error, George Johnson, of burglary, and *609 sentencing him therefor to confinement in the penitentiary for the term of five years, the period by the jurors in their ver-diet *ascertained. There were two trials in the case, both of them on the general issue joined on the plea of not guilty. The first trial commenced on the 10th day of November, 1877, when the jury having heard the evidence and not agreeing upon a verdict, were committed to the custody of the sergeant of the city on the usual charge and oath in such cases. On the 12th day of the same month the accused was again led to the bar in the custody of the sergeant, and the jury were also brought into court in the custody of the said sergeant, and still failing to agree upon a verdict, for reasons appearing to the court the said jury was discharged. Afterwards, and at the same hustings court, continued by adjournment and held on the 16th day of the same month, the case was again tried, when the jury found the accused guilty, and ascertained the term of his confinement in the penitentiary at five years. He thereupon moved the court to set aside the verdict and grant him a new trial, which motion the court overruled. On the 23d day of the same month he was sentenced according to the verdict of the jury. During the progress of the trial he excepted to five decisions of the court given against him, and tendered to the' court his five several bills of exceptions, which were received, signed and sealed by the court, and ordered to be made parts of the record. The accused applied to this court for a writ of error to the judgment, which was accordinly awarded.
The petition for a writ of error assigns various errors in the said judgment, the first of which is, in the action of the court in discharging the first jury, there being "no manifest necessity” for such discharge. I see no error in the action of the court in that respect, but there is no necessity for deciding the question in this case, and it is not intended to be decided; it being sufficient to say in regard to this assignment of errGr that no objection *was taken in the court below to the action of the court in this respect.
The other errors assigned in the petition are founded on the five bills of exceptions which were made parts of the record, and which 1 will now proceed to consider, but as they all depend on the fifth bill, which is made a part of each of the other four, and in which all the evidence introduced on the trial is set out, I will consider the question arising on that bill in the first place. My opinion upon that may render it necessary to take little or no notice of the other bills.
The fifth bill of exceptions is to the action of the court in overruling the motion of the accused to set aside the verdict, because the same is contrary to law and the evidence; and on the motion of the accused the court certified the evidence taken in the case, which is as follows:
Bifth Bill of Exceptions.
“Be it remembered that on the trial of this case, after the evidence for the Commonwealth had been heard, and argument by counsel, the jury retired to make up their verdict, and after some time returned into court and returned their verdict, which is in the figures and words following, to-wit: ‘We, the jury, find the prisoner guilty, and ascertain the term of his confinement in the penitentiary at five years.’ And thereupon the prisoner, by his counsel, moved the court to set aside said verdict, because the same is contrary to law and the evidence. But the court overruled the said motion, and the prisoner excepted to the ruling and judgment of the court, and moved the court to certify the evidence taken in his case, and sign and seal and make this, his bill of exception, a part of the record, which is accordingly done.”
And the court certifies the evidence as follows: Julian B. Crenshaw, a witness for the Commonwealth, was *sworn, and testified that he boarded at the St. Clair hotel on corner of Grace and Ninth streets, Richmond, Ya. About 3 o’clock A. M., day breaking about twenty minutes after, on the 30th day of October, 1877, my room was entered; my room is in the new building of the St. Clair hotel, of the city of Richmond, of which Stephen Hunter and E. S. Pendleton are proprietors. There are eight or nine rooms on the hall of that floor, I think, the rooms being on each side of the hall; my room is on the western side of the hall, and not quite midway; it is No. 1 i, and the window looks out on the yard of the hotel; when I went to bed my door was shut with the ordinary latch, but not locked, and could have been opened from the outside by simply turning the knob; when 1 first awoke about 5 A. M., I heard my door creak; I listened and heard distinctly steps on the threshold; then heard it pass along the hall four or five steps; the person appeared then to stop; then heard a sound as of some one touching the wall or a door; I then got up and struck a light, and found my door slightly ajar, four or five inches, and no one but me in my room; went to the door and looked out into the hall; it was perfectly dark, and I could not see any one in it; I looked to see if anything was gone from my room; I had that night about fifty dollars in the left pocket of my pants; I found it was'gone; I then dressed, went down stairs, and told the night clerk of my loss and gave him my suspicions; after consultation with him, he thought it advisable to go to room No. 11 for trace of my money or the person who too it; No. 11 is on the same floor, the door about fifteen feet from mine, on the opposite side of the hall or passage, and the window opens out on Ninth street; my room is between rooms No. 12 and No. 16; : No. 13 is opposite my room and No. 11 ! opposite No. 12; the night clerk, Mr. John *L. Weatherford, sent for a policeman, and when he arrived we *610 went up to room No. 11; Mr. Weatherford led the way, and we. .knocked, and receiving no answer, knocked again; when Carter opened the door, Weatherford asked who occupies this room? Carter answered he did with his friend; Weatherford asked what friend, or some such question, and Carter answered “Davis;” we had then got on the threshold; Mr. Weatherford was in the room; Weatherford asked Carter who registered the names; Carter said he did, and being reminded he had not registered any such name as Davis, he corrected himself and said, “Oh, his name in Johnson, George Johnson;” the' names registered on the book were “C. D. Carter” and “George Johnson;” not much talking was done on either side after we got in the room; I don’t think there was any light when we knocked at the door; there was one very soon after we got in; either Weatherford or John T. Hall, the police officer, said: “Your neighbor across the way has been robbed of some money, and they were looking for it; these men did not appear to express any surprise; Johnson said it was rather a cool reception; the policeman told them both to get ready and come along with him; the police and Weatherford made a partial search of the room, also of some bags or valises — I think one valise and one bag; I saw several things they found, among others a file. (A file was here shown to witness and identified.) I think it was found in Johnson’s valise; I know Weatherford or Hall asked him about it; they were looking over his valise, and they held it up and said, “Hullo! what’s this?” 'He replied, “It belongs to a friend of mine.” He was asked 'what friend, and answered, “No matter; if you can make any use of it, do so.” I also saw a collar with a name on it, which I spelt as best. I could, “Canne;” Johnson took it up, but I don’t know whether it was his or not; *lhere were some papers found upon them with other names still; there was a railroad pass with the name of L. L,ewis; it was on buff paper, not like ordinary railroad tickets, but like a railroad pass.
When I awoke I heard the door creak and four or five steps; could not tell and would not say in which direction they were going; my belief at the time was they were going in a room. I heard some other little noise, but cannot say what it was; the sound created the .impression on my mind that some one had touched a door, or was at a door; the steps were distinct. I lost about fifty dollars; It might have been forty-nine dollars or'fifty-one dollars; I had not had it out of my pocket for a day or so, but felt it in my pocket that night before I went to bed; put my hand in my pocket, and know it was there when I went to bed. I am very positive, I did not lose it in my room; I put my'pants on a chair, but am sure it did not drop, out; my pants were in three feet of the gas, and I dressed there to go to the office'. I passed by No. 11, going to the steps at the end of the hall on my way to the office, No. 11 being nearer the steps than my room. Nos. 10, 11, 12, and 9 are all nearer the steps than my room. When you get to the end of the hall you turn to the right in a kind of elbow of the passage, then pass on a few steps to the stairway to the story above; the steps from the story above land in this elbow at the end of the passage. A person coming down those steps lands right at No. 9; the steps going down stairs go from that elbow; there is no exit from the passage at the other end of it. Carter and Johnson both manifested some curiosity as to whether I saw the party who entered my room; Johnson asked me if I saw the party. I replied I did not. One said they had known each other sixteen years ago in New Orleans, but had not met since until a day or two ago in Washington *city, and came down here together; they were then in the prisoners’ box at police court; Johnson was walking about in the prisoners’ box, and I think could have heard the conversation, but I do not know whether he did or not; it was loud enough for Johnson to have heard it, but I cannot say whether he heard it or not.
On cross-examination he testified as follows:
I found my coat, pants and vest on the chair as nearly as possible as I left them when I went to bed; I had felt the money in my pocket that night when I went to bed, but had not had it out of my pocket for several days; I had in my pocket a twenty dollar bill, two tens, a five and one or two twos and ones; there are two servants that attend my room, one a male servant, the other a female servant named Matilda, I don’t know her other name; they have a pass-key to my room; I have seen them with a bunch of keys going round the room doors; the thief might have disturbed my clothes in getting the money from my pocket, but if he did he had placed them back as he found them; but steps I heard did not appear to die away, but just to stop; I did not see any one when I looked out into the hall from my room. There was no twenty dollar bill found either upon the prisoners or about their baggage that I know of, but there was not a thorough search made, they only searched through their pockets and pocket-books; they' did not search the room they were in so thoroughly but that the money might have been in the room and still not have been found; there., were some things found on them, after they were carried to the station 'house, that we did not find on them in the preliminary search. Before I saw Weather-ford," I had no impression it was in No. 11 any more than any other room on that floor.I knew it was not in the room immediately adjoining mine by the steps I heard. My idea, when I first heard the door creak and *the steps on the floor, was that it might be a robber going into another room to rob somebody else; I listened a short time and heard no sound of any kind. The bureau drawers in the room were opened, but I have no recollection of search inside of bureau. They shook up the bed a *611 little, looked under the pillows, bolster and bed-clothes, about, the bureau, mantel-piece and washstand.
John L- Weatherford, another witness for the Commonwealth, after being sworn, testified:
I am night clerk at the St. Claire hotel, and was on duty at the time of the occurrence. I have a list of the occupants of the rooms on that floor that night; there are eight rooms on that floor, numbered from 9 to 16. In No. 9, were W. L. C. Walker, of Tappa-hannock, J. E,. Gaines, of Charlotte county, and J. A. Coleman, of Halifax; in No. 10, Were Henry Taylor, of Louisa, M. A. Miller, of Staunton; in No. 12, Miss Miller, of Staunton; in No. 9, L. Lewis, of Clarke county; in No. 13, the Rev. Preston Nash, United States army; in No. 15, Dr. George West and wife; in No. 14, Mr. J. B. Cren-shaw; and ill No. 11, C. L. Carter and George Johnson, Atlanta, Ga. I knew all but these two; Crenshaw came to me about twenty to twenty-live minutes after 5 o’clock, A. M.; about 5 o’clock, I went up to the room of another Mr. Crenshaw, No. 17, to wake him; No. 17, is on the floor above 11 and 14, and immediately over No. 9; the steps from that floor come down at the end of the passage, on the floor below, just opposite the door of No. 9, which is next to No. 11; a few minutes before 5 o’clock, I came down these stairs, having waked Mr. Crenshaw up stairs before I came down; as I came down I examined the hall; as I reached the door nearly opposite No. 9, I heard something that caused me to stop; that noise continued until the latch fell; I knew *it was the latch of No. 11; when I heard the latch, I passed the door of No. 11 and No. 14; No. 14 door was closed, two lights were burning in the passage; I expected to be called, but hearing nothing, I turned back and went to the office; I was satisfied the noise was in No. 11 before I heard the latch catch; I then heard the latch catch, and am positive it was No. 11; the first sound was as if some one was pushing the door gently to, and then the distinct click of the latch. It was about 5 o’clock when 1 got back to the office, and about six minutes to 5 when I left the office to go up to No. 17 to wake the other Mr. Crenshaw up. In twenty to twenty-five minutes, Mr. Julian B. Crenshaw, who was robbed, came down and told me he had been robbed. We then sent for Mr. John T. Hall, sergeant of the city police, and he went off and got a warrant and returned with officer John D. Perrin, and at about 6 o’clock, A. M., we all went up to No. 11, and I knocked at the door. There was no answer to the first knock, and I knocked again; then one of these men, Carter, answered and opened the door. I stepped in and asked Carter who occupied the room? He said, “I do.” 1 also said, who is your friend? and he said, Mr. Davis. 1 asked him, did you register the names? and he said, “Oh, yes, that is George Johnson.” I then said to Kim, your friend has come in rather unexpected, you did not expect him until this morning; how did you get up to your room? He answered me, T did expect him last night, and I did not tell the clerk 1 did not expect him until this morning; he came last night, and 1 brought him up to the room. George Johnson was then lying in bed. I said to him, Carter, your neighbor across the hall here has been a little unfortunate, and lost some money, and we have come in here to get it. (I did not mention the circumstances of having heard his door shut.) There *was but one bed in the room, and both of them slept in it. He said, well, it’s all right, sir, you can look, we know nothing about it. Some search was then made of the room. A valise was handed me, and in it I found some clothing, some writing material, and this file. This is a common file, an ordinary machinist’s file. When you find burglars with one, it is of that character. I did not find anything else, but saw a counterfeit five dollar bill one of the officers found. I also saw one hundred and eighty or one hundred and ninety dollars in money, and some railroad tickets that were found. I did not go to the station-house with them. I searched a valise and a satchel; in the stachel I found some clothing and a pistol. The pistol was found in a small satchel claimed by Carter. Johnson said, yes, it’s an English pistol — its mine. Nippers being shown the witness, he said, I first saw them Tuesday last, the 13th day of November — that is a burglar’s instrument, used to open a door from the outside when the key is in the lock. Two keys were here shown the witness, and he said, these keys are burglar’s keys; I tried them the other day, and opened every door in the City Hall but two or three with them. A knife, the blade in imitation of a fine saw, was here shown witness; he said it was taken from Johnson’s clothes. I can file an iron bar with this. He then said, L went into the room first; both were awake and both undressed. Carter had shirt and drawers of red flannel. Johnson stirred in bed. They had no access either to their clothes or baggage after we entered their room. They answered my second knock. They showed no agitation or excitement. Carter claimed the satchel and Johnson the valise. I saw the money that was taken from them, and saw there was no twenty dollar bill among it. Only a partial search was made of the room. I took off the clothing of the bed and ^searched the bed; I have been a professional detective; I moved the bed from the wall, seached the bureau, took out the two bottom drawers, searched the washstand, look the top off that; I stopped searching because T thought I had searched enough; I looked around under the edge of the carpet and for holes in it; there was no other piece of furniture or anything else in the room that we could have searched; I do not know how many men slept on that floor on that night; there were two servants on that floor, Nelson Meadows and Matilda Otey. As I went uj> *612 to No. 17, I saw Nelson asleep in the bathroom; Matilda has a room next to the bathroom', but I do not know whether she was in her room on that night or not; there was a boy named Richard, floor servant, on the floor above; any servant in the house could have gone through and returned from the passage as I did; the room has been occupied since the arrest of the prisoner; I saw an excursion ticket from Washington to Richmond and return, among the articles found on the prisoner; the doors to the hotel were all locked except the door to the office in which I sat.
John T. Hall, police officer, another witness for the Commonwealth, after being sworn, testified:
On the 30th day of October last, about half-past five o’clock A. M., I was sent to for to — the St. Claire hotel; I went there and was informed by Mr. Weatherford that a robbery had been committed. I went up to the room of these two men, and Weather-ford knocked two or three times on the door, when Carter opened it, Johnson being still in bed; I told him to get up and dress himself; Weatherford entered the room first and spoke to Carter; asked him who is your friend in bed, and he said Davis; he then said, oh, Johnson! I searched them while they were dressing by searching each piece of-clothes before they put them on; I searched their *baggage, but did not make a thorough search of that until we got to the station-house; I found this file in Johnson’s valise, and found in Johnson’s pocket-book one hundred and eighty-four dollars in money, and in Carter’s pocketbook ten dollars, five of which was a counterfeit five dollar bill, the balance in ones and a two; I searched the bed, the bureau, and in fact everything in the room; I found nothing in the bureau; I pulled the drawers of the bureau out so as to see in them good, but found nothing in them; I did not see the nippers now shown me in the bureau; I then took the prisoners to the station-house, then searched them again, separated them and questioned them; I asked Johnson how long he had known Carter, and he told me he never saw him until the day before he met him in Washington. I then searched their baggage carefully and found two skeleton keys in the lining of the hat, a black slouch hat in the valise; the keys were wrapped up in a piece of brown paper; these were in Johnson’s valise; also found a piece of wax and two keys; the keys are called skeleton keys; I also found two small wooden keys; they are called pattern keys from which keys are moulded; they were in Carter’s pocketbook; I saw them last in the police court, but have not seen them since; the book shown me I took from Carter, and it has “J. D. Cannon’s book” written in it; this book has been in Carter’s possession since the hearing at the police court, and the name does not look as plain as it did down there; the tickets I saw were in this book, and are in the words and figures following, to-wit:
This blank is to be filled up at the mailing office and,given to thfe person who presents the letter for registration.
*Receipt for a Registered Letter.
No. 337. ' -, 1877. Postoffice D-, received of H. Burton,
-326 E. 14-,. a letter addressed to T.
D. Van Horn, New Orleans, La.
T. Miley; Jr., P. M.
Endorsed on face: Registered October 10, 1877, branch D, New York postoffice.
Return Registered Letter Receipt.
Note.- — This return receipt, after being signed by the party to whom the letter or package which accompanies .it is delivered, must be immediately enclosed to the postmaster at the office where it originated. -
Should the registered letter not be delivered, this receipt must be forwarded with it in due course, to the dead-letter office.
No. 2220. -■, 1877
6
, Mailed at-, by Charles T. Burton, 139 E. 19 -, a letter addressed to Charles G. Irish, - 303 Washington street, Buffalo, N. Y.
Received the above described letter.
Charles G. Irish.
Sign here,
J.
Stamp here the office and date of delivery: Buffalo, N., September 5, 1877, registered.
*Endorsed on face: Registered September 1, 1877, branch D, New York postoffice.
There was one pass for L. Lewis and another for Lewis Lewis; they are not now in the book; I have gotten such articles as this file, nippers and skeleton keys from burglars.
On cross-examination he said: I did not take out the bureau drawers, and set them on the floor; I am pretty certain they were not taken out by any one. I made a more careful search of the room than usual; I wanted to find that money. The town was flooded with thieves and burglars during the late visit of the President; the money I found on Johnson consisted of three fifty dollar bills, three tens and two twos. The first thing I said when I went into the room was to tell Johnson to get up; I have no recollection of telling him I wanted that fifty dollars; the keys might have worked themselves inside the hat where I found them.
Dr. E. S. Pendleton, another witness for the Commonwealth, after being sworn, testified:
I am one of the proprietors of the St. Clair hotel. Since the arrest of the prisoners two ladies, one Miss Booten and the other Miss Stansbury, two ladies of excellent standing, have been the only occupants of room No. 11 until the day before yesterday; the nippers were in the hands of the attorney for the Commonwealth before that.
On cross-examination he said: I cannot say no one else has been in the room since the arrest of the prisoners, and don’t know *613 how many people have occupied that room since. The bureau has been in it now about eighteen months; don’t know where the bureau came from; think it came from Watson’s factory; nearly all our furniture came from there.
*Matilda Otey, another witness for the Commonwealth, after being sworn, testified:
I am a waiter at the St. Claire hotel, and heard of the robbery next day. I was asleep in my room at the time it occurred, and had not been upon that floor since about ten o’clock that night. I found this instrument (the nippers) in No. 11; it was inside of the top drawer of bureau. I found it one day this week in taking out the drawers of the bureau to dust in behind them; as the ladies always like to have everything clean about the bureau I always take the drawers out to dust them.
J. B. Angle, a policeman, and witness for the Commonwealth, after being sworn, testified:
I searched the valise at the station-house. The hat (a black slouch hat) lay in the valise on one side of it. The hat was mashed flat, and the keys, wrapped in brown paper, were inside of it. The valise was pretty full. The keys lay inside the hat, and there was no lining inside of the hat. Don’t think the keys • mid have worked themselves in the hat, but they might have done so. The valise was pretty full, but more could have been gotten into it.
I certify that the foregoing is the substance of the evidence introduced for the Commonwealth in this case, there being no evidence for the defence.
Witness my signature and seal.
A. B. Guigon. [Seal.]
To stistain a charge of a criminal offence there must be proved, first, the corpus delicti; and, secondly, that the accused committed the offence charged against him. In this case there was sufficient proof of the corpus delicti, of the breaking and entering in the night time, by some person, of the dwelling-house of another, with *intent to commit a felony therein; in other words, of a burglary, as charged in the indictment.
But was there sufficient proof that the accused committed the offence to warrant his conviction thereof by the jury? To warrant such conviction, the evidence should be such as, if true, to exclude all rational doubt of the guilt of the accused.
T do not think it was such in this case. The evidence introduced, and not the facts proved on the trial, is certified in the bill of exceptions. No evidence was introduced in behalf of the accused; and in considering this question we must regard as true all the evidence of the witnesses introduced in behalf of the Commonwealth.
So regarding the evidence, did it warrant the verdict of the jury? Did it legally show that the accused committed the burglary charged against him? Again I say, I think not. It makes out no more than ground for suspicion against the accused, however strong that suspicion may be. It falls short of proof of his guilt beyond all rational ground of doubt to the contrary. The evidence tending to connect the accused with the offence charged, if there can be said to be any such evidence, is inconclusive, and is consistent with an hypothesis which assumes the innocence of the accused of the offence charged in the indictment. That burglars’ instruments were found in possession of the accused, if such was the fact, was a suspicious circumstance, and tended strongly to show that the accused had come to Richmond on the occasion of the crowd which at that time assembled in the city, with a purpose on his pari to avail himself of any opportunity he might have on that occasion to commit such an offence. But surely that evidence was wholly insufficient, in itself, to connect the accused with the particular offence charged against him in the indictment. And there was little other evidence in the case *to strengthen and support that evidence; certainly not enough, in my opinion, in connection with that evidence, to establish his guilt of the offence charged beyond a rational doubt to the contrary. That the accused, at the time of the. commission of the offence, occupied a room in the same hotel with the room which was broken and entered, and that the two rooms were on the same passage, though on opposite sides, and but fifteen feet apart, are also suspicious circumstances, when taken in connection with the tools found in possession of the accused as aforesaid. They at least show that the accused was near enough to commit the offence. The same may be said of the circumstance that when Crenshaw, whose room was opened and entered, awoke, “he heard the door creek and four or five steps; he could not tell, and would not say, in which direction they were going, though his belief at the time was, they were going in a room; he heard some other little noise, but could not say what it was; the sound created the impression on his mind that some one had touched a door, or was at a door; the steps were distinct.” And the same may be said of the Éircumstance stated by the witness Weatherford, the night clerk at the St. Claire hotel: “About 5 o’clock A. M., which was but a few moments before the alleged burglary was committed, he went up to the room of another Mr. Crenshaw (No. 17), to wake him; No. 17 is on the floor above 11 (occupied by the accused), and 14 (occupied by the Cren-shaw whose money was alleged to have beer: stolen, and immediately over No. 9); the steps from that floor came down at the end of the passage, on the floor below, just opposite the door of No. 9, which is next to No. 11; a few minutes before^ 5 o’clock, witness came down these stairs, having waked Mr. Crenshaw up stairs before he came down; as witness came down he examined the hall; as he reached *the floor, nearly opposite no. 9, he heard something that caused him to *614 ..stop; that noise continued until the latch fell; he knew it was the latch of No. 11; when he heard the latch he passed the doors of-No. 11 and No. 14; No. 14 was closed; two lights were burning in the passage; witness expected to be called, but hearing nothing, turned back and went to the office; he was satisfied the noise was in No. 11, before he heard the latch catch; he then heard the latch catch, and-was positive it was No. 11; the first sound was as if some one was pushing the door gently to, and then the distinct click- of the latch. ' It was 5 o’clock when he got back, and about six minutes to 5 when he left the office to go up to No. 17, to wake the other Mr. Crenshaw up. In twenty to twenty-five minutes, Mr. Julien B. Crenshaw, who was robbed, came down and told witness he had been robbed.”
These circumstances, taken singly or all together, while they create a suspicion of guilt, are yet inconclusive and wholly insufficient to prove such guilt. _ They are consistent with the fact of guilt, but are also consistent with the fact of innocence. If they be not at least as consistent with the fact of innocence as with the fact of guilt, they certainly do not amount to such degree of proof as to connect the accused with the offence and to warrant his conviction thereof.
But the other evidence in the case, so far from strengthening the suspicion of guilt, rather tends to weaken if not disprove it. There were two obvious modes of connecting the accused with the offence, either of which would have' been probably sufficient for • the purpose if it had been sustained by evidence. One was, by identifying the accused as the person who entered the room of J. B. Cren-shaw; and the other was, by identifying some of the money found in possession of the accused as the money, or some of it, which had been stolen from Cren-shaw. *But so far from identifying the accused as the person who entered the room of Crenshaw, the latter did not see the person who entered his room, either while such person was in the room or before or after he entered it. While Crenshaw heard distinctly steps on the threshold and passing along the hall, he- did not see the person whose steps he heard. And so far from identifying some of the money found in possession of the accused as the money, or some of it, which had been stolen from Crenshaw, not a dollar of the latter was identified; but on the contrary, it was proved that a twenty-dollar bank note was a part of the money taken from Crenshaw, and yet no such note was found in the possession or room of the accused. It is difficult to believe that the money of Crenshaw could have been stolen by the accused without being found in his room on the search which was made therein by Crenshaw, the owner of the money, Weatherford, the night clerk at the St. Claire hotel, and Hall, the police officer, almost immediately after the offence was committed. When they went to the room of the accused to make the search they found the door closed, and the accused and his companion, Carter,- were undressed and in bed. They denied their guilt,'manifested no alarm, and invited a search of themselves and their room and of everything in it; which search was accordingly made, and though $184 in money were found in the pocketbook of Johnson, the accused, and $10 in the pocket-book of Carter, five of which was a fiye dollar counterfeit bill, not a dollar of either parcel was identified as a part of the money which had been stolen from Cren-shaw; and the twenty-dollar note which was stolen from him could not possibly have been a part of the money found as aforesaid. It was argued that the search was not complete, and some of the evidence tends to show that such was the case. But certainly the three *persons who made the search had the strongest motives to make it complete, so far as it could reasonably be expected to lead to the discovery of the money, supposing it to be in the possession or room of the accused. Each of them testified as to the manner and extent of the search, and it is difficult to conceive how it could have been more complete than it was. Reference can be had to their testimony to see how complete the search was. While certain tools, which were called in the argument burglars’ tools, were found in the possession and room of the accused and his companion, Carter, in making the search, not one of them could have been used in breaking and entering the room of Crenshaw, the door of which was not even locked, and was opened and entered merely by turning the knob on the outside.
Another material circumstance of the case in connection with the one last stated, is, that when the alleged offence was committed all of the rooms near the one occupied by Crenshaw, and no doubt most of those in other parts of the hotel, were occupied by guests, and there were two servants, one a male and the other a female, who attended to his room and had a pass key to it, and who slept on the same floor with the said room on the night on which it was broken and entered. Now, without meaning to say, what certainly does not appear, that the evidence in this case creates the slightest suspicion that any one of these guests and servants, other than the accused, was guilty of the offence charged against him, certainly - the circumstance just stated is material to be considered in deciding the question whether the conviction of the accused was warranted by the evidence in the case.
I will now notice such of the cases referred to in the argument of the case as I deem material to be noticed, from which it will appear that the evidence, supposing it *all to be true,-was wholly insufficient to warrant the conviction of the accused.
In Algheri v. The State of Mississippi, 35 Miss. R. 584, referred to by the counsel of the plaintiff in error, it was held by the high court of errors and appeals of that state: 1st. That in the application of cir *615 cumstantial evidence to the determination of a case, the utmost caution and vigilance should be used. 2d. That it is always insufficient, where, assuming áll to be proved which the evidence tends to prove, some other hypothesis may still be true; for it is | the actual exclusion of every other hypothesis which invests mere circumstances with the force of truth; and 3d. That where the evidence leaves it indifferent which of several hypothesis is true, or establishes only some finite probability in favor of one hypothesis, such evidence cannot amount to proof, however great the probability may be. The second and third of these propositions were literally taken from 1 Stark, on Ev. 572, and correctly expound the law.
I will cite only two other of the cases referred to by the counsel for the plaintiff in error, but they are cases of the highest authority, being the unanimous decisions of our late general court when it was our court of appeal in criminal cases, and when it was composed of judges of the greatest ability and experience, especially in regard to the criminal law. I mean Grayson's case, 6 Gratt. 712, and same case, 9 Id. 613. Gray-son was twice convicted of murder and sentenced to be hung therefor. Judge Field, who presided at each trial, refused in each case to grant a new trial on the ground that the verdict was contrary to the evidence. And the general court, in each case, reversed the judgment and remanded the cause for a new trial to be had therein. Judge Scott, who delivered the opinion of the court in the former case, concluded it by saying: “In the case at bar my opinion *is, that there is no evidence which connects the accused with the homicide of which he has been convicted; that at most it amounts only to a suspicion that he had some hand in it, and that the evidence is plainly insufficient to warrant the verdict.” Judge Leigh, who delivered the opinion of the court in the latter case said: “The court is fully_ aware of the weight which ought to be given to the two concurring verdicts approved by the judge who presided at the trials, and if, in our opinion, the evidence made even a probable case of guilt, we would be unwilling to disturb the judgment. But at the la,st term this court was of opinion, unanimously, that the evidence introduced on the first trial was plainly insufficient to connect the accused with the murder. The evidence on the second trial is somewhat different from the evidence on the first trial, but this difference is favorable to the accused, and after examining the testimony anew, _ we are again unanimously of opinion that it is . wholly insufficient to sustain the verdict ] and judgment.” I
The principle of these two cases is dircctly applicable to this; and according to the principle the judgment in this case ought to be reversed on the ground that the evidence in the case was insufficient to support the verdict.
I do not think there is anything in the cases cited by the attorney-general in conflict' with those above referred to. They apply more to the questions arising on the other bills of exceptions, or some of them, than to that arising on the 5th, now under consideration. They are the cases, 1st, of the Commonwealth v. Williams, 2 Cush. R. 582; 2d. The People v. Larned, 3 Selden R. 445; and 3d. Poster v. The People, 10 Supreme Court Reports, N. Y. 6. In the first of these cases, it was held that on the trial of an indictment for breaking and entering a building and stealing therefrom, a number of burglarious tools and implements found together in the possession of *the defendant at the time of his ar-1 rest, may be brought into court and exhibited to the jury, although some of them only, and not the residue, are adapted to the commission of the particular offence in question. In the second, it was held that tools with which a burglary is supposed to have been committed, may be exhibited to the jury in connection with evidence tending to. show them to have been used in its commission and to connect them with the prisoner. And in the third a box containing burglars’ tools, found in the office of the Adams Express Company at Boston, shortly before the burglary, was produced and identified at the trial. It was proved that it was made for the prisoner; that it was taken to his residence and sent away by an express wagon; that it was marked with the name of Foster, (his name), and that he, with another person, was at the express office when it was found. It was held that the evidence was sufficient to connect the prisoner with the box, and that an objection to its reception in evidence, on the ground that such connection was not sufficiently established, was not sustainable. In all these cases the tools found in the possession of the accused, or at least a part of them, were such as might have been used, and no doubt were so, in the commission of the offence charged against him. In this case, none of them were, or could have been, so used. The diversity between those cases and this, is therefore most obvious.
Besides the two cases of Grayson, cited by the counsel for-the plaintiff in error from the decisions of the highest court of appeal in criminal cases in this state, there are two cases recently decided by this court which have an important bearing upon this case. In each of them the opinion of the court was delivered by my brother Christian, and the court was unanimous. In one of them, Smith’s case, 21 Gratt, 809, the question was to the *corpus delicti, on a charge of murder of a bastard , me, e ,... murder, the death of a person charged to have been murdered must be proved by the most cogent and irresistible evidence, either by witnesses who were present when the murderous act was done, or by proof of the child. The court held that on a trial for body having been seen dead, or by proof of criminal violence adequate to produce death, and which accounts for the disappearance of the body. Every one who reads the evidei. _e in the case must be morally *616 convinced that a murder had been committed, and that the accused was guilty of the offence, but there was not sufficient evidence of the corpus delicti for his conviction, and this court, therefore, reversed the judgment against him. In concluding his opinion, Judge Christian said, that “tutius semper est errare in acquietando, quan in puniendo, &c., is the wise and humane maxim of the criminal law.” The same sentiment has often been expressed by another maxim of the same law, that “it is better that ninety-nine (that is, an indefinite number of) guilty persons .should escape punishment) than that one innocent person should be punished.” In the other of the two cases referred to, Pryor’s case, 27 Gratt. 1009, the rules in relation to new trials, stated in Grayson’s case, 6 Gratt. 712, and Blosser v. Harshbarger, 21 Id. 214, were approved and reaffirmed; and in that case (Pryor’s) the evidence being wholly circumstantial, it was held in the appellate court to be plainly insufficient to warrant the finding of the prisoner guilty of the offence charged in the indictment.
I am therefore of opinion, that the court of hustings erred in overruling the motion of the plaintiff in' error to set aside the verdict.
In regard to the questions presented by the 1st, 2d, 3d and 4th bills of exceptions, very little need be said. The 5th bill of exceptions being made a part of each of the *other bills of exceptions, and the evidence set out in the 5th bill of exceptions being plainly insufficient to convict the accused of the burglary charged against him in the indictment, the evidence set out in the other bills of exceptions was at least inadmissible in connection with the other evidence set out in the 5th bill of exceptions, and the hustings court therefore erred in overruling the motions to exclude the evidence mentioned in the 1st, 2d, 3d and 4th bills respectively, made after all the evidence set out in the 5th bill of exceptions had been introduced. It is very common and sometimes proper to admit evidence when first offered which may by evidence subsequently .introduced be‘ rendered admissible, and afterwards to exclude it when not made admissible by evidence subsequently introduced. In this case all the evidence set out in the 5th bill of exceptions being wholly insufficient to connect the accused with the offence, those parts of the said evidence which are set out in the other bills of exceptions thus became inadmissible, and the hustings court erred in overruling the motions of the plaintiff in error to exclude them.
I am therefore of opinion, that the judgment of the hustings court ought to be reversed, the verdict of the jury set aside, and the cause remanded to the said hustings court for a new trial to be had therein, in conformity with the foregoing opinion.
Christian, J., concurred in the opinion of Moncure, P.
The other judges concurred in the opinion of Moncure, P., on the fifth exception.
There was a diversity of opinion on the questions involved in the other exceptions.
The judgment was as follows:
For reasons stated in writing and filed with the record, *the court is of opinion, that in regard to the first assignment of error in this case, to-wit: that “the said hustings court erred in discharging the jury regularly empanelled and sworn on Saturday, the 10th day of November, 1877, to try the issue joined between the Commonwealth and the petitioner,” &c., it is sufficient to say that no objection was taken in the court below to the action of the court in this respect; and no further notice will be taken of that subject.
But the court is further of opinion, in regard to the fifth bill of exceptions, which is to the action of the said hustings court in overruling the motion of the plaintiff in error to set aside the verdict of the jury, “because the same is contrary to law and the evidence,” that the evidence set out in the said bill of exceptions, which was all the evidence introduced on the trial of the case, was wholly insufficient, even conceding it all to be true, to connect the plaintiff in error with the offence charged against him in the indictment and to warrant his conviction thereof by the jury; and that the said hustings court, therefore, erred in overruling the said motion to set aside the said verdict.
In regard to the other bills of exceptions, to-wit: the first, second, third and fourth, the court is not unanimous; a majority of the judges being of opinion that the said hustings court did not err in overruling any of the motions to exclude any of the evidence mentioned in the first and fourth of said bills; but did err in overruling the motions to exclude the evidence mentioned in the second and third of said bills. In regard to the second bill of exceptions, however, the said majority consisted of but three judges, one of whom is of opinion that the said hustings court would not have erred in admitting as evidence the conversation therein mentioned upon condition that the jury believed that the said conversation *was heard by the accused; and the said judge is of opinion that evidence of the said conversation ought to have been admitted upon that condition.
Therefore it is considered, ordered and adjudged by the court, that for the errors aforesaid, the said judgment of the said hustings court be reversed and annulled, the said verdict of the jury be set aside, and a new trial be awarded to the plaintiff in error for the said offence; and the cause is remanded to the safd hustings court for a new trial and further proceedings to be had therein in conformity with the foregoing opinion; which is ordered to be certified to the said hustings court of the city of Richmond.
Judgment reversed.